**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 21-cr-00310-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     **CARLOS GUADALUPE SANCHEZ-FELIX**,

      Defendant.

---

**GOVERNMENT'S RESPONSE TO DEFENDANT CARLOS GUADALUPE SANCHEZ-FELIX'S MOTION TO DISMISS THE INDICTMENT [DOC. 22]**

---

      The United States of America, by and through Matthew T. Kirsch, Acting United States Attorney for the District of Colorado, and Valeria Spencer, Assistant United States Attorney, respectfully submits this Response to Defendant's Motion to Dismiss the Indictment. [Doc. 22].

      The Court should deny Defendant's Motion. Congress has plenary power over immigration affairs and its decisions are subject to a highly deferential standard of review. The illegal reentry law easily passes that low standard. Moreover, Defendant's motion fails to account for the fact that the "governing statutory framework" of United States' immigration law comes from 1952, not the 1920s.  Defendant's Motion should be denied without an evidentiary hearing.

**I.**     **FACTUAL BACKGROUND**

      Defendant was encountered in the District of Colorado on June 8, 2019, in the Adams County Jail, where he had been arrested and detained for Distribution of Controlled Substances.

Defendant pled guilty to a Class 3 Drug Felony and was sentenced to three years prison in the Colorado Department of Corrections (CDOC). Upon the conclusion of his state sentence and release from custody, he was picked up by Immigration and Customs Enforcement (ICE) officials based on a detainer lodged with CDOC.

In previous interviews with ICE officials, post-*Miranda*, Defendant admitted he was a citizen of Mexico without any documents that would allow him to enter or remain in the United States. Records show that Defendant had been previously removed to Mexico on January 4, 2019, and thereafter had re-entered the United States without proper consent from the United States government. Records checks confirmed Defendant had not applied nor received permission to reenter the United States.

Defendant was indicted on September 20, 2021, on a single count of illegal reentry of a removed alien in violation of 8 U.S.C. § 1326 (a), (b)(2).  On November 5, 2021, Defendant filed the instant motion to dismiss. The United States now responds.

## II.   **RESPONSE**

### A.   Statutory Background

With the Immigration Act of 1917, Congress passed legislation requiring the deportation of aliens who entered the United States "at any time or place other than as designated by immigration officials, . . . or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. There was no penalty other than repeated deportation for reentering after deportation. Accordingly, to enhance the deterrent value of the deportation laws, the 70th Congress made reentry after deportation a felony offense punishable by up to two years'

imprisonment. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018.[1] . The Senate Report from the

Committee on Immigration outlined the purpose of the law:

> Except [for "members of the anarchistic and similar classes"] . . . there is no provision
> of law under which a penalty, other than repeated deportation, can be imposed on
> aliens who have been expelled from the United States and who reenter the country
> unlawfully. It frequently happens that aliens of the criminal and otherclasses who are
> deported under the general immigration law reenter the country unlawfully. As a matter
> of fact, in some instances such aliens have been deported four or five times, only to
> return as soon as possible to the United States in an unlawful manner.

S. Rep. No. 70-1456, at 1 (Jan. 17, 1929). The report then set out the parameters of the

proposed illegal reentry crime and stated, "It is believed that such a statute would be of material

aid in enforcing our immigration laws." *Id.*

Charged at that time with enforcing the country's immigration laws, the Secretary of the

Department of Labor agreed. In a letter made part of the Senate Report, the Secretary stated that

the proposed law "would be of material assistance in the administration of existing immigration

laws." The Secretary continued,

> It is academic that no prohibitive law can successfully be enforced without a
> deterrent penalty. The fact that possible deportation is not a sufficient deterrent
> to discourage those who seek to gain entry through other than regular channels
> is demonstrated by the frequency with which this department is compelled to
> resort to deportation proceedings for the same alien on several succeeding
> occasions. . . Aside from the sexual immoral and members of the anarchistic
> and similar cases there is nothing in the immigration laws which penalizes
> aliens for reentering the United States unlawfully after they have been deported
> at considerable expense to the Government. The enactment of a law imposing
> a penalty is recommended.
>
> *Id.*

---

[1] The text stated, [I]f any alien has been arrested and deported in pursuance of law, he shall be excluded from
admission to the United States whether such deportation took place before or after the enactment of this Act, and if
he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this Act, he
shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly
provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or
by both such fine and imprisonment.

Over twenty years later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), an act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction). In this renewed and comprehensive legislation (codified at 8 U.S.C. § 1 et seq.), Congress passed another crime for reentry of a deported alien.  The text stated,

> Any alien who (1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at any time found in, the United States,unless (A) prior to his re-embarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony[.]

*Id.* at § 276, 66 Stat. 229 (8 U.S.C. § 1326).

Over the years, Congress has updated § 1326 multiple times, always to increase its deterrent value. For instance, in the Anti-Drug Abuse Act of 1988, the 100th Congress added subsection (b) to § 1326, creating enhanced penalties for aliens with prior felony convictions. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181. Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (increasing penalties); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (among other things, limiting collateral attacks on deportation orders in § 1326 prosecutions); and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed"). Congress's continual strengthening of § 1326's deterrent value "suggests a crystallizing vision on Congress'spart of the need for stern punishment in this

4

milieu." *United States v. Dwinells*, 508 F.3d 63, 69 (1st Cir. 2007); *see also United States v. Shill*, 740 F.3d 1347, 1352 & n.5 (9th Cir. 2014).

## III.   **ANALYSIS**

### 1.   Rational Base Review

The ultimate purpose of Defendant's Motion is to convince the Court to find that the crime of illegal reentry served a discriminatory purpose at its inception and, therefore, the Court should declare the modern version, codified at 8 U.S.C. § 1326, to be unconstitutional as it violates equal protection. Motion at 3. Such a declaration would necessitate the dismissal of his indictment.

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017). As such, while not actually containing an equal protection clause itself, the Fifth Amendment still mandates all laws passed by Congress must not violate the principle of equal protection. An equal protection violation need not appear on the face of the statute; rather, a litigant may show the challenged law was enacted with "an invidious discriminatory purpose [which] may often be inferred from the totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 241-42 (1976),

Despite Defendant's citations to several cases concerning state law (Motion at 5), the fact is that he is directly challenging federal immigration law.  It has repeatedly been affirmed that judicial inquiry into immigration legislation is very limited, given that "over no conceivable subject is the legislative power of Congress more complete than it is over the admission of

aliens." *Fiallo v. Bell,* 430 U.S. 787, 792 (1977) (quotation omitted).  Indeed, when exercising

its plenary powers in matters of immigration and naturalization, *i.e.* exclusion and deportation,

"Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews v.*

*Diaz*, 426 U.S. 67, 80 (1976). Recently the Supreme Court has reaffirmed the limited role of

judicial review, as it pertains to immigration law.

> For more than a century, [the Supreme Court] has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'… Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'

*Trump v. Hawaii*, 138 S. Ct. 2392, 2418–19 (2018) (quoting *Fiallo*, 430 U.S. at 792; *Matthews v.*

*Diaz*, 436 U.S. at 81.).  Most critically, and largely in part to the unique prerogative just detailed,

the standard of review for an equal protection claim challenging an immigration law has already

been determined; when "Congress exercises these powers to legislate with regard to aliens, the

proper standard of judicial review is rational-basis review." *Soskin v. Reinertson*, 353 F.3d 1242,

1255 (10th Cir. 2004); *Trump*, 138 S. Ct. at 2419 (A "deferential standard of review" applies in

the immigration context.); *Appiah v. INS*, 202 F.3d 704, 710 (4th Cir. 2000) ("[J]udicial review

over federal immigration legislation has always been limited."). Here, since Defendant is

challenging the constitutionality of a decade's old immigration law, precedent dictates that the

Court should decide the matter with a rational basis review.

The rational-basis test is deferential. It simply requires courts to determine whether the

classification in question is, at a minimum, rationally related to a legitimate governmental purpose.

*Younger v. Colorado State Bd. of L. Examiners*, 625 F.2d 372, 376 (10th Cir. 1980); *see also*

*Jurado-Gutierrez v. Greene*, 190 F.3d 1135, 1152 (10th Cir. 1999), as amended on denial of

reh'g (Nov. 29, 1999)(The distinction between "deportable" and "excludable" is subject to rational basis review. The government's legitimate interest in expeditiously removing criminal aliens was rationally related to the means.).

The test is met where "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). The government "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Id*. Instead, the "burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it[.]" *Id*.

In the instant matter, the Court only need decide whether § 1326 is rationally related to a legitimate government interest. The government has an interest in ensuring compliance with deportation orders and promoting respect for this country's legal immigration process. This interest is achieved by deterring illegal reentry into the United States. The relationship between that interest and § 1326, which provides sanctions for repeated violations of United States immigration law, is axiomatic. It is obvious that § 1326 rationally relates to that interest by sanctioning those who disregard a previous deportation order. This analysis is not just the United States proffering a legal position in the instant matter, it is long held and widely accepted.

To be sure, the government's interest is centuries old. The Supreme Court recognized as much, at least as far back as 1893, with the following proclamation: "[t]he right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, being an inherent and inalienable right of every sovereign and independent nation, [is] essential to its safety, its independence, and its welfare[.]" *Fong v. United States*, 149 U.S. 698, 711 (1893). The right of a sovereign to criminally sanction those illegally within its borders is of a

similar vintage. *See Wong Wing v. United States*, 163 U.S. 228, 235 (1896) ("[I]t would be plainly competent for Congress to declare the act of an alien remaining unlawfully within the United States to be an offence punishable by fine or imprisonment.").

As detailed above, and as common sense informs, the government has a legitimate interest in deterring illegal reentry. There is a clear rational relationship between that interest and § 1326 which provides sanctions for, and therefore, actual deterrence of, repeated violations of the United States' immigration laws. *See e.g. United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) ("[I]t is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration- regulation authority would be fatally undermined—all bark and no bite."); *United States v. Henry*, 111 F.3d 111, 114 (11th Cir. 1997) ("Section 1326 is not based upon any common law crime but is a regulatory statute enacted to assist in the control of unlawful immigration by aliens." (citation omitted)); *United States v. Cupa-Guillen*, 34 F.3d 860, 863 (9th Cir. 1994) ("[T]here is a strong societal interest in controlling immigration and in effectively policing our borders. This interest is furthered by enhancing punishment against persons who illegally enter the country after having previously committed aggravated felonies.").

Based on conclusive precedent and the undeniable enumerated power over nationalization and immigration granted to Congress by the Constitution, it is apparent that § 1326 satisfies rational basis review. It is also important to reiterate that under rational basis review the government has no obligation to produce evidence to sustain the rationality of the challenged law. *See Heller*, 509 U.S. at 320. To the contrary, the burden to negate "every conceivable basis" that supports the rationality is on the challenger of the law. *See id*. Here

Defendant has failed to even attempt such a showing.

Rather, Defendant takes an alternative approach, blatantly ignoring Congress's plenary immigration powers in order to avoid the inevitable failure under the rational basis test and attempts to apply the Supreme Court's ruling in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), to claim § 1326 is unconstitutional. The United States takes the position that the proper standard of review for an equal protection challenge against § 1326 is the rationale basis test, and for the aforementioned reasons, that test has been satisfied. For the sake of thoroughness, the United States will address Defendant's *Arlington Heights* argument, demonstrating that his position is without merit.

2.      Arlington Heights

A law may violate equal protection in three ways.  First, a law may discriminate on its face. *See*, *e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967).  Second, authorities may apply a facially neutral law in a discriminatory way. *See*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). And third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group.  *See*, *e.g.*, *Arlington Heights*, 429 U.S. at 265–68.

Defendant challenges § 1326 only under the third rationale, thus, the concentration on *Arlington Heights*. In that case, the Supreme Court held "[w]hen there is a proof that a discriminatory purpose" motivated a legislature to pass a law, a court should subject that law to heightened scrutiny. *Id.* at 265-66. To determine whether a discriminatory purpose motivated a legislature to pass a law, a court examines numerous factors, including but not limited to, the law's impact, its historical background, "[t]he specific sequence of events leading up to the challenged decision," the legislature's substantive departures from the normal lawmaking process, and legislative or administrative history. *Id.* at 266-68. If the law's challenger produces

evidence that a discriminatory purpose motivated a law's passage, then the burden shifts to the government to prove that the legislature would have passed the law "even had the impermissible purpose not beenconsidered." *Id.* at 270 n.21.

*Arlington Heights* involved a rezoning request to accommodate the placement of low-income housing which is hardly applicable here. Indeed, Defendant has found only one case finding *Arlington Heights* to be applicable to any immigration laws passed by Congress. Motion at 6 and attached as Exhibit A.[2] The expansive *Arlington Heights* inquiry is antithetical to the long-standing principle that, with regard to congressional immigration policy, it is "not the judicial role . . . to probe and test the justifications for the legislative decision." *Fiallo*, 430 U.S. at 799. There is no probe more exacting than *Arlington Heights*, which invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." 429 U.S. at 267-68. That does not comport with the plenary power given to Congress over immigration policy that must be crafted by statute and the narrow judicial review over such policymaking.

That aside, Defendant's argument is that a "close examination of the political context underlying the criminalization of illegal reentry in 1929 reveals a disturbing truth: that racism and  eugenics were not only a 'motivating factor' in the legislature's passage of [the Undesirable Aliens Act of 1929]. They were a primary factor." (Motion at 7) (quoting *Arlington Heights*, 429 U.S. at 265)). For evidence, Defendant does not do a deep dive into the Congressional record to provide a full picture of the complicated nature of immigration legislation, instead, he

---

[2] Attached as Exhibit 2 is a list of cases across the country where defendants have filed the same or similar Motions to Dismiss Indictment, on the same grounds as in this case.  Only one court has held for the Defendant, Opinion and Order in Defendant's Exhibit A.

provides cherry picked comments of randomly selected Congressmen from the 1920's (and sweeping academic denunciations of some of the attitudes of that decade).

Ultimately, Defendant relies heavily on racially problematic quotes from approximately eight or nine Congressmen to establish the primary motivation for the Undesirable Aliens Act of 1929 was racism and eugenics.  This logic is flawed as there were more  than nine guys in Congress in 1929.[3] The fatal flaw is that this selective history does not explain why Congress passed the Immigration and Nationality Act of 1952 ("INA"), the law that replaced the Undesirable Aliens Act of 1929, and the law that Defendant is accused of violating. *See* Pub. L. No. 82-414, 66 Stat. 229 (codified as amended at 8 U.S.C. § 1326). To challenge the relevant law, the one that still exists, Defendant must provide evidence that a discriminatory purpose motivated Congress to pass the INA in 1952[4] He offers nothing factual in this regard.

Instead of evidence concerning the formulation of the actual law at issue as required for any Arlington Heights assessment, Defendant merely cites several cases which apply the holding of Arlington Heights. Defendant briefly discusses a few cases in which the holding of Arlington Heights was applied to find that certain state laws and actions were unconstitutional. The first among them is Hunter v. Underwood, 471 U.S. 222 (1985). In Hunter, the Supreme Court considered whether a section of the Alabama State Constitution, which disenfranchised

---

[3] In 1929 there were 531 voting members on Congress. This is of public record.
[4] See *McClesky v. Kemp*, 481 U.S. 279, 298 n.20 (1987)("[T]he 'historical background of the decision is one evidentiary source' for proof of intentional discrimination….But unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value…. Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent." (citations omitted)); *see also Abbot v. Perez*, 138 S. Ct. 2305, 2324 (2018) ("The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination. '[P]ast discrimination cannot, in the manner of original sin, condemn government action that is not itself unlawful.'" (alteration in original) (quoting *City of Mobile v. Bolden*, 466 U.S. 55, 74 (1980)); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 215-16 (1983) (refusing to presume that California enacted one law "for the same purposes" as other laws with "a common heritage" because "these other states laws are not before the Court…and their pedigree do not taint other parts of the" law at issue).

persons convicted of certain enumerated crimes, as well as "crimes of moral turpitude," violated

the Equal Protection Clause because its original purpose was to primarily disenfranchise blacks.

Id. at 223-24. This dastardly purpose was undeniable, as even the appellants did not dispute that

the "zeal for white supremacy ran rampant" at the 1901 Alabama Constitutional Convention. Id.

at 229. Moreover, the president of the convention announced in his opening remarks some of

the goals of the convention; "what is it that we want to do? Why it is within the limits imposed

by the Federal Constitution, to establish white supremacy in this State." Id. (quoting 1 Official

Proceedings of the Constitutional Convention of the State of Alabama, May 21st, 1901 to

September 3rd, 1901, p. 8 (1940)).

The Supreme Court found that the appellant's own explanation effectively conceded

both that "discrimination against blacks, as well as against poor whites, was a motivating factor

for the provision and that § 182 certainly would not have been adopted by the convention or

ratified by the electorate in the absence of the racially discriminatory motivation." *Id.* at 231.

The key to *Hunter* is that there really is no contest, just concession of original racist

motivations when the provision was enacted as well as current discriminatory outcomes. The

appellant's ill-fated strategy of trying to convince the Court that the motivation to

disenfranchise poor whites should mitigate the primary purpose to disenfranchise blacks, was

foolhardy. *See Id.* 230. This is in stark  contrast to the instant matter, in which there is no such

concession of racist animus as a primary factor in the formation of immigration enforcement

laws. There has been no evidence presented of inappropriate motivations concerning § 1326,

the proper statute.

A single federal district court judge found that *Arlington Heights* applies to § 1326,

*United States v. Carillo-Lopez,* 2021 WL 3667330 (D. Nev. Aug. 18, 2021). The case is on

appeal to the 9th Circuit. Referenced by Defendant in a single paragraph at page 6 of his

Motion, in a lengthy opinion the *Carrillo-Lopez* Court ruled that "a prior version of a statute

[1929 law] known to be motivated by racial animus may be considered as infecting its present

iteration [1952 law] if it was not, in fact, substantially altered" which the court found it was not.

*Id*. at \*10. The court held in keeping with *Arlington Heights* and *Hunter*, that § 1326 disparately

impacted racial groups. Judge Miranda is the sole outlier in the jurisprudence quickly arising

from this one motion. Attached as Exhibit 1 is the slip copy from the only case within the Tenth

Circuit (to date) that the government could find ruling on this particular (and nearly stock)

motion. *United States v. Novondo-Ceballos*, 2021 WL 3570229 (D. N.M. Aug. 12,

2021)(decided one week before *Carillo-Lopez)* specifically held that *Arlington Heights* did not

apply, and that the rational basis standard of review was applicable in analyzing § 1326. Id. at

\*3.  The Court found that § 1326 satisfied the rational basis test

> 3.      Immigration and Nationality Act of 1952 ("INA")

As briefly discussed above, Defendant's challenge to § 1326 focuses entirely on the

legislative motives of the 1929 Congress, rather than the Congress that passed, or repeatedly

amended, §1326. It must be reiterated that Defendant is challenging the constitutionality of a

repealed law. *Arlington Heights* directs the courts to look at the motivation behind the official

action being challenged. *Id*. at 265-67 (describing intent analysis in terms of "the challenged

decision"). The challenged decision in this case is the decision to criminalize the conduct

Defendant is charged with committing, illegal entry. Any hypothetical constitutional harm

suffered by Defendant stems from that charge, not a different law enacted in 1929. This means

that the Court must seek to discern the intent of the Congress that enacted § 1326 specifically,

rather than the intent of previous Congresses. To counter this deficiency, Defendant boldly

asserts that "*Ramos* and *Espinoza* confirm that not only must courts examine the racial motivations of a law at the time of its passage, but also that later reenactments do not cleanse the law of its original taint." (Motion at 21.) The cases cited by Defendant do not support that proposition.

In *Ramos v. Louisiana*, the Court held that Louisiana's and Oregon's laws allowing non-unanimous jury convictions violated the Sixth Amendment. 140 S. Ct. 1390 (2020).  While the Court, and even the States, acknowledged that race was a motivating factor in the adoption of their respective non-unanimity rules, neither that reality, nor *Arlington Heights*[5] were the reason for the decision. *See Id.* at 1394. The holding was that the Sixth Amendment right to jury trial, as incorporated against the States by way of the Fourteenth Amendment, requires a unanimous verdict to convict a defendant of a serious offense, no matter when or why a law that allowed non-unanimity was enacted. *Id.* at 1397. The opinion made clear that this was always the case, and previous interpretation and precedent allowing nonunanimous jury felony convictions were simply incorrect. *Id*. at 1397-1408.[6] As such, *Ramos* does very little to support Defendant's contention.

As for *Espinoza v. Montana Dep't of Revenue*, that was a case concerning the Free Exercise Clause of the First Amendment and the Court applied strict scrutiny because Montana's law prohibiting families from using state-sponsored scholarships at religious schools discriminated based on religious status.  140 S. Ct. 2246, 2257 (2020).  It had nothing to do with race or *Arlington Heights* and did not even address the alleged violation of the Equal Protection

---

[5] *Arlington Heights* is not mentioned once in the opinion and Ramos did not "bring an equal protection challenge." *Id.* at 1410 (Sotomayor, J., concurring).

[6] The decision abrogated *Apodaca v. Oregon*, 406 U.S. 404 (1972) and *Johnson v. Louisiana*, 406 U.S. 356 (1972).

Clause.  *Id.* at 2263 n. 5.  Once again, Defendant's reliance on Supreme Court precedent is misguided.

The United States does agree that *Ramos* and *Espinoza* support the broad contention that subsequent enactments of a statute do not erase its historical context. But *Ramos* and *Espinoza*, neither of which involved an equal protection challenge, did not hold that the discriminatory motivations of a previous legislature are determinative of the outcome of an *Arlington Heights* analysis, the subject of which is a law enacted by a subsequent legislature. Defendant assumes and acts as though they do, and that is one of the reasons the motion is a failure. It is not unreasonable to propose that the legislative history of past enactments may be probative of the motivations of the legislators who enacted the current law. However, the Court should not automatically impute these past motivations to the current law and forgo analysis of the enacting legislature, as specifically required by *Arlington Heights*. *Cf. Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) ("[W]e have never suggested that past discrimination flips the evidentiary burden [of the intent test] on its head."). The Court therefore must consider whether Defendant has shown that Congress's 1952 enactment of § 1326 was motivated, at least in part, by a discriminatory purpose.  Defendant has not even attempted to make such a showing.

Defendant points out that "when a court determines that a law's 'original enactment was motivated by a desire to discriminate . . . on account of race and the section continues to this day to have that effect,' the court must conclude that the law 'violates equal protection under *Arlington Heights'*." (Motion at 22) (quoting *Hunter*, 471 U.S. at 233). Ironically, this supports the United States' argument because it highlights Defendant's failures of proof.  Defendant offers nothing to suggest that the INA was originally enacted with the desire to discriminate and that any disparate impact of § 1326 is easily explainable on grounds other than racial

discrimination.[7]

Defendant cites the high percentage of illegal-reentry prosecutions of Mexican and Latin American defendants as proof of disparate impact and discrimination. It is not. Those numbers are a product of geography, not discrimination. For instance, in FY19, Border Patrol had 859,501 total encounters. See https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics. Ninety-nine percent of those encounters (851,508) occurred on the southwest border. See https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019. Those numbers are neither surprising nor illuminating of Congress' motives in the 1920s. Indeed, if it were enough to state an equal protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity, including those from a country sharing 1,954 miles of border with the United States—virtually any such law could be challenged on that ground. *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915-16 (2020) (pl. op.) (finding disparate impact of DACA rescission for Latinos from Mexico—totaling 78 percent of DACA recipients—did not establish plausible equal protection claim; "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds") (citation omitted); *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern.").

---

[7] The proximity of a very large population of Hispanics to the Southern Border, as well the political and financial realities unique to Central America, explain the disproportionate number of Hispanics charged with violating § 1326. The statistics Defendant cites for disparate impact are a feature of Mexico's proximity to the United States, the history of Mexican employment patterns, and other socio-political and economic factors that drive migration from Mexico to the United States, not discrimination. That alone is enough to reject Defendant's *Arlington Heights* analysis.

Even if the Court agreed with Defendant and applied the heightened scrutiny of *Arlington Heights*, the challenge to § 1326 would still fail.  Under *Arlington Heights* framework, a law survives a constitutional challenge if the government can prove that Congress would have passed the law, here the INA,[8] even if Congress had not considered "the impermissible purpose." *Id.* at 270 n.21. Defendant offers no evidence that an impermissible purpose motivated Congress's passage of the INA; instead, he confines his evidence  and argument to the INA's much older predecessor.

This means the United States simply has to offer a legitimate reason that would rationally justify § 1326. That reason is that our nation has a sovereign right to protect its borders and control the influx of those attempting to cross over those borders.  Enacting laws to prevent an unmitigated influx of foreign nationals and contraband is necessary to protect the citizens of the United States.  The federal government has an interest in ensuring compliance with federal law, deportation orders and promoting respect for the country's legal immigration process. Deterring illegal reentry into the United States helps protect these interests and rights. That is why 8 U.S.C. § 1326 is law and would still be the law regardless of any impermissible purposes that can be concocted by politically motivated academics.

### 4.    Evidentiary Hearing

Finally, Defendant requests an evidentiary hearing. His entire claim rests on *Arlington Heights*. As detailed above, his claim fails for many reasons besides *Arlington Heights*' in applicability to this case. Therefore, there is no reason to hold an evidentiary hearing. *See, e.g., United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980) (evidentiary hearing not required

---

[8] Defendant's belief that the United States would have to show that the Undesirable Aliens Act of 1929 would have been passed by Congress had the impermissible purpose not been considered is mistaken.  The actual question before the Court would be whether the United States had proven that Congress would have passed the INA, the law that Defendant allegedly violated, had Congress not considered the alleged discriminatory purpose.

where the materials provided to the court "show as a matter of law that [the defendant]was not entitled to relief"). The government could only find two courts that have granted an evidentiary hearing when presented with this exact same argument: *Carillo-Lopez*, attached as Defendant's Exhibit A, and *United States v. Machic-Xiap*, 2021 WL 3362738 (D. Ore. Aug. 3, 2021) order denying the Motion attached as Exhibit 3.

Moreover, Defendant admits that his proposed witnesses are experts regarding the Undesirable Act of 1929 and will testify about the historical events surrounding its passage. (Motion at 28). Such testimony would be unnecessary for the Court to determine the constitutionality of § 1326. The facts presented by Defendant essentially resolve the matter in favor of the United States.  An evidentiary hearing is unnecessary if the claim can be resolved on the record. *Torres v. Mullin,* 317 F.3d 1145, 1161 (10th Cir. 2003). The Court has already been presented with enough information regarding what some college professors thought about the 1920's.  There is no need to consider irrelevant material twice.[9]

## IV.   <u>CONCLUSION</u>

Defendant's motion should be denied because: (1) immigration laws are subject to a highly deferential standard of review. Section 1326 bears an undeniably rational relationship to the government's legitimate interest in enforcing its immigration laws, thereby, satisfying rational-basis review; (2) in the highly deferential context of immigration legislation, courts should be hesitant to probe the alleged motives of those who passed the challenged law; (3) even

---

[9] A significant percentage of Defendant's motion consists of excerpts taken from academic publications. As already pointed out, this Motion is not novel. Indeed, district courts across the Circuits have squarely rejected the defendant's argument. *See e.g., United States v. Palacios Arias*, No. 3:20-cr-62-JAG, ECF No. 37 at 6 n.7 (E.D. Va. Oct. 13, 2020) ("Even assuming, however, that the Court can consider the discriminatory purpose that the defendant alleges motivated Congress to pass the Undesirable Aliens Act of 1292, this evidence has only marginal relevance to the defendant's challenge to the INA, passed by Congress twenty-three years later.").  See Exhibit 2 for a list of courts that have addressed this issue without an evidentiary hearing (excepting the two courts as previously noted).

if the Court deemed it necessary to apply *Arlington Heights*, Defendant's challenge to § 1326 would nonetheless fail because it focuses entirely on the legislative motives of the 1929 Congress, not the Congress that actually passed, or repeatedly amended, § 1326; and (4) the United States had several legitimate purposes to enact and enforce illegal reentry laws and the theory that § 1326 would not have been enacted but for racist ideology is unfounded.

For the reasons and authorities stated above, the United States respectfully requests that this Court deny Defendant's Motion to Dismiss the Indictment and find no need to hold an evidentiary hearing.

Dated this 19th day of November, 2021.

Respectfully submitted,

MATTHEW T. KIRSCH
Acting United States Attorney

*s/Valeria Spencer*
VALERIA SPENCER
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
E-mail: valeria.spencer@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, November 19, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.


_s/Portia Peter_
Portia Peter
Legal Assistant
United States Attorney's Office