IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA

v.

CARLOS GUADALUPE SANCHEZ-FELIX,

Defendant.

Criminal: 1:21-CR-310 (PAB)

CARLOS GUADALUPE SANCHEZ-FELIX'S REPLY TO THE "GOVERNMENT'S RESPONSE TO [HIS] MOTION TO DISMISS THE INDICTMENT"

In its response to Mr. Sanchez-Felix's motion to dismiss the indictment, Docket Entry Number ("DE") 26, the government never meaningfully counters that discrimination was a "motivating factor" in Congress's criminalization of illegal reentry. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Nor does it show that Congress would have passed the domestic criminal statutes in the Undesirable Aliens Act of 1929 (including its recodification in the Immigration and Nationality Act of 1952 ("INA")) "even had the impermissible purpose not been considered." *Id.* at 270 n.21. Indeed, the government totally ignores the expert opinions of historians in this field, and barely even acknowledges the voluminous record of racist statements by legislative and executive officials underlying the illegal reentry law. DE 22:11 – 15. Instead of grappling with, and acknowledging in a fair-minded way, the troubling racist history of § 1326, the government simply dismisses it.

The INA's reenactment of the 1929 Act did nothing to address the former's discriminatory inception — quite to the contrary, Congress expressly chose to "carr[]y forward" and "substantially reenact[]" the existing law, and such pro forma reenactments do not detach a law from its original intent. The government attempts to avoid this problem by avoiding meaningful review altogether,

n
n
n
n

suggesting that as long as a law touches on immigration, judicial scrutiny is curtailed. But a century's worth of precedent flatly rejects this striking proposition.

## I. SECTION 1326 VIOLATES DUE PROCESS

As shown below, the Court should find that § 1326 violates equal protection under *Arlington Heights*, or, at a minimum, hold a hearing to determine whether Congress would have passed the 1929 Act (or the INA) without this discriminatory intent.

### A. Pro forma reenactments have not cleansed § 1326 of its racist origins.

The government claims that the racist motivations for the 1929 Act are of little import because Congress reenacted that statute as part of the INA, and thereafter increased the penalties for the offense several times. DE 26:11 – 15. The government fails to recognize that Mr. Sanchez-Felix presented examples of contemporaneous evidence from the passage of the INA in 1952, which included the almost identical crime of illegal reentry, that reveal the same racial animus against Latinx people permeated its enactment. DE 22:22 – 23. For example, then-Deputy Attorney General Peyton Ford wrote a letter in 1951 in support of the bill to the Chairman of the Senate Judiciary Committee, Pat McCarran (D-Nev.), describing the bill's targets as "wetbacks," and President Truman had vetoed the bill expressly because it "would perpetuate injustices of long standing against many other nations of the world," and because the bill would "continue, practically without change," the discriminatory practices of the 1924 and 1929 versions. DE 22:22 – 23.

Regardless, over a century of Supreme Court opinions establish that a statute originally passed for one purpose does not take on another purpose through pro forma reenactments; indeed, a contrary rule would allow subsequent legislatures to shield racist laws from judicial review simply by reenacting them. *Cf. Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 484 (1997) ("Quite obviously, reenacting precisely the same language would be a strange way to make a change."). And a pro forma reenactment is precisely what Congress did in 1952: voicing its desire to have the 1929

Act "carried over," it re-codified it without acknowledging its racist foundations. The same is true for Congress's subsequent ratcheting-up of the penalties of the crime.

Just last term, two Supreme Court decisions emphasized that reenacting a law passed with discriminatory purpose does not cleanse the law of that purpose. First, the majority in *Ramos v. Louisiana* rejected Justice Alito's dissent arguing that recodification of a jury non-unanimity rule cleansed it of its racist intent. Concurring, Justice Sotomayor explained that while *Ramos* did not involve an equal protection challenge, the racist history of the jury non-unanimity laws at issue was "worthy" of the Court's "attention," because the states' legislatures "never truly grappled with the laws' sordid history in reenacting them." *Id.* at 1410 (citing *United States v. Fordice*, 505 U.S. 717, 729 (1992) for the proposition that "policies that are 'traceable' to a State's *de jure* racial segregation and that still 'have discriminatory effects' offend the Equal Protection Clause"). Justice Sotomayor suggested that a new law may "be free of discriminatory taint" if the "legislature actually confronts a law's tawdry past in reenacting it," but not when, as in *Ramos* (and the instant case), the legislature merely points to other, "'legitimate' reasons for . . . reenactment." *Id.*

Then, in *Espinoza v. Montana Dep't of Revenue*, the majority highlighted a law's "checkered tradition" of underlying religious discrimination when overturning it, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." 140 S. Ct. 2246, 2259 (2020). Concurring, Justice Alito noted that because "I lost, and *Ramos* is now precedent," the Court could examine the original motivation for the laws even when legislators had "readopted their rules under different circumstances in later years." *Id.* at 2268 (quotations omitted).

The statements in *Ramos* and *Espinoza* underscore both the Supreme Court's willingness to consider the discriminatory origins of reenacted laws and the importance it places on "purg[ing] racial prejudice from the administration of justice," *Ramos*, 140 S. Ct. at 1418 (Kavanaugh, J. concurring) (quoting *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 867 (2017)), and must not be

ignored. Nevertheless, while admitting that it "does agree that *Ramos* and *Espinoza* support the broad contention that subsequent enactments of a statute do not erase its historical context," DE 26:15, the government attempts to sidestep the teachings of *Ramos* and *Espinoza* by noting that the cases arose under the Sixth and First Amendments, respectively, rather than the Fifth Amendment's equal protection guarantee. DE 26:14-15. But *Ramos* and *Espinoza* cannot be distinguished and confined in the *ad hoc* way the government offers up.

First, the cases limn an approach that is, in the words of Justice Alito, "now precedent." *Espinoza*, 140 S. Ct. at 2268 (Alito, J., concurring). And to the extent the Court considers any of the statements regarding the discriminatory origins of a law as dicta, lower courts are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *United States v. Nelson*, 383 F.3d 1227, 1232 (10th Cir. 2004).

Second, the government suggests *Ramos*' analysis is confined to the Sixth Amendment context – and that the enforcement of a domestic criminal statute relating to alienage warrants different treatment – but it gives no principled reason to think that this is true beyond the undisputed point that *Ramos* did not involve an equal protection challenge. DE 26:14. Illegal reentry isn't an alienage law; it is a domestic criminal statute, similar to the statutes at issue in *Ramos*. As a result, individuals like Mr. Sanchez-Felix are entitled to full Due Process protection under the Fifth and Fourteenth Amendment. *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). The government's attempt to distinguish *Ramos* accordingly fails. Its attempt to explain away *Espinoza* similarly fails. Indeed, Justice Alito's concurrence in *Espinoza* carefully examined history to determine whether a reenacted statute was still infected with its predecessor's discriminatory intent. *Id.* at 2268-2274. That is exactly what Mr. Sanchez-Felix asks the Court to do here. DE 22:19-21.

In arguing that the legislative intent underlying the 1929 Act is irrelevant to its pro forma reenactment in the INA, DE 26:13 – 14, the government ignores the teachings of *Ramos* and *Espinoza*, instead citing cases supporting the proposition that, in some circumstances, later reenactments may cleanse a law of its original taint. But the statements in *Ramos* and *Espinoza* must not be ignored. In fact, its provenance stretches back over 100 years. In *Bear Lake & River Waterworks & Irrigation Co. v. Garland*, 164 U.S. 1 (1896), the Supreme Court held that when a statutory repeal and recodification has no impact on the intended effect of the substantive provisions that remain the same, "the new act should be construed as a continuation of the old with the modification contained in the new act." 164 U.S. at 11-12 (citing *Pac. Mail S.S. Co. v. Joliffe*, 69 U.S. 450, 458 (1864) ("The new act took effect simultaneously with the repeal of the first act; its provisions may, therefore, more properly be said to be substituted in the place of, and to continue in force with modifications, the provisions of the original act, rather than to have abrogated and annulled them"); *see also Oneida County v. Oneida Indian Nation of New York State*, 470 U.S. 226, 246 & n.18 (1985) (the Supreme Court articulated the same standard, citing the same cases, when interpreting the federal Nonintercourse Act). The upshot of these decisions is that, "when an existing statute is reenacted by a later statute in substantially the same terms," the "unchanged provisions which are repeated in the new enactment are construed to have been continuously in force." 1A N. Singer & J. Singer, *Statutes and Statutory Construction* (7th ed. 2009) § 23:29; *see also Fordice*, 505 U.S. at 728 ("[A] State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation").

And that is exactly what happened with the 1929 illegal reentry law and the INA's reenactment of the same provision. Indeed, there is little difference between the two; the two provisions codify the same crime: whoever enters the United States after being removed or

excluded is guilty of a felony and subject to two years' imprisonment. Perhaps if Congress had returned to the proverbial drawing board, grappled with the law's racist origins and consequences, and decided it was nonetheless good policy, the government would have a point. *See Ramos*, 140 S. Ct. at 1410 (Sotomayor, J., concurring). But that's not what happened here. The government offers no evidence that Congress did so and offers no principled reason why any subsequent reenactment – no matter how insubstantial – would neutralize a law's racist foundations.

Here, the government has not shown that Congress meaningfully reevaluated the illegal reentry statute when enacting the INA. Nor could it. Although, as the government notes, the INA was designed to reorganize the nation's immigration laws, Congress explicitly decided that "the present Act of March 4, 1929 should be reenacted" within the new INA. S. Rep. No. 81-1515, at 655 (1950), *reprinted in Trelles, Oscar & James F. Bailey, Immigration and Nationality Acts: Legislative Histories and Related Documents* 1950-1978. Explicitly recodifying the same offense, on the same terms, with substantially the same language is a no way to mark a change. *Reno*, 520 U.S. at 484. The government does not allege that any of the subsequent reenactments of § 1326 involved any real reconsideration of the law. DE 26:4.

### B.   The court should assess Mr. Sanchez-Felix's equal-protection challenge under the *Arlington Heights* framework and apply strict scrutiny.

Jettisoning traditional equal-protection analysis – which starts by focusing on the classification – the government argues that the *Arlington Heights* framework has no place in evaluating Mr. Sanchez-Felix's equal-protection challenge. DE 26:5 – 13. Instead, it contends that the federal government's sovereign authority to regulate entry and exclusion requires the Court to evaluate the law – as distinct from the classification drawn by the law – under a rational-basis review. DE 26:6. The unstated principle appears to be that, no matter how odious, flagrant, or

despicable a law or government action may be, courts must give it hands off deference whenever it is rationally related in some way to regulating immigration.

This argument has been raised and rejected before. In *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, the government claimed that a race-based equal-protection challenge to its DACA-termination decision was either not cognizable or subject to a modified, deferential equal-protection review. 908 F.3d 476, 518-20 (9th Cir. 2018). The Ninth Circuit disagreed, applied *Arlington Heights*, and found the Latino plaintiffs had stated a viable equal protection claim. *Id.* At least five members of the Supreme Court agreed that *Arlington Heights* applied, but ultimately rejected the plaintiffs' claim on its facts. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915-16 (2020); *id.* at 1917-18 (Sotomayor, J.); *see also CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 324–25 (D. Md. 2018) ("In the immigration context, a government's classifications on the basis of nationality are sensibly reviewed deferentially, as nearly all immigration policies involve some degree of classification on the basis of nationality … But that rationale does not justify, as Plaintiffs allege, the government's discrimination in this case on the basis of race or color, which are distinct from individual Plaintiffs' national origin. Therefore, the Court holds that the analysis outlined in *Arlington Heights* controls.") (citation omitted). Put simply, "application of the Arlington Heights framework is appropriate" to evaluate race and ethnicity challenges involving immigration. *California*, 476 F. Supp. 3d at 1023.

Logically, if that is true in civil actions involving decisions about who can live and work in the United States, it can be no less true where an in-country defendant claims that the government is seeking to punish him under a racially motivated criminal law. Indeed, over a century ago in *Wong Wing v. United States*, 163 U.S. 228, 237 (1896), the Supreme Court drew an express distinction between civil entry bars and removal orders, on the one hand, and criminal prosecutions, on the other, holding that greater protections necessarily apply when the government

seeks to "punish[] by deprivation of liberty and property." In the decades since, the Court has continued to apply that rule, recognizing that the threat of criminal sanction necessarily warrants increased judicial scrutiny. *E.g. Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (recognizing that "government detention violates [the Due Process Clause] unless the detention is ordered in a criminal proceeding with adequate procedural protections").

Thus, even if the government's deference argument has purchase in some settings, where domestic criminal penalties begin, hands-off judicial review of immigration laws necessarily ends. Were the rule otherwise, the government would be empowered to impose racially disparate criminal penalties on immigrants within our borders. Because that cannot possibly be, the traditional equal-protection framework embodied by *Arlington Heights* applies. Simply, this case involves race and ethnicity discrimination, which, unlike alienage, merit strict scrutiny. *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) ("Because racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification, our review of whether such requirements have been met must entail a most searching examination"). There is no immigration exception allowing Congress to pass racially discriminatory domestic criminal laws.

While the government seeks to recast Mr. Sanchez-Felix's challenge as one to a "legislative decision" based on alienage, his motion makes abundantly clear that the challenge is not grounded in distinctions between admissibility and exclusion. Rather, it is focused squarely on animus toward Hispanic and Latinx people in enacting a domestic criminal statute. Mr. Sanchez-Felix knows of no modern case – including in areas of maximal government deference – where race and ethnicity classifications have received anything but the most exacting scrutiny. *See Korematsu v. United States*, 323 U.S. 214, 216 (1944), over'd on other grounds by *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018); *Johnson v. California*, 543 U.S. 499, 512 (2005).

In this case, surviving that scrutiny requires showing that the illegal-reentry provision in the 1929 Act (and the INA) would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 265-66 & n.21. While the government seeks to avoid that standard, it does so not because applying it would be incorrect as a matter of law, but because the challenged law can't possibly meet it.

### C. Section 1326 continues to "bear[] more heavily" on Mexicans and Latinos, which is all that *Arlington Heights* requires to show disparate impact.

The government does not contest Mr. Sanchez-Felix's evidence showing that Mexican and Latino defendants have made up the overwhelming majority of people charged and convicted under § 1326. DE 22:23 – 27. Instead, it claims the disparate impact is "a product of geography, not discrimination" DE 26:16. But this argument conflates the law's *reasons* with it *results*. The government cannot dispute that § 1326 "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266. That is all that is required, since a law violates equal protection if its "original enactment was motivated by a desire to discriminate" and it "continues to this day to have that effect." *Hunter*, 471 U.S. at 233. Under *Arlington Heights* and *Hunter*, it is irrelevant whether § 1326's present disparate impact is a product of "geography" or "discrimination." All that matters is that it does overwhelmingly impact Hispanic and Latinx communities today.

### D. As confirmed by voluminous documentary evidence and the proffered testimony of experts, congress passed the illegal-reentry law with invidious intent.

In cursory and conclusory form, government suggests that Mr. Sanchez-Felix did not capture the true legislative intent – enforcement of immigration laws. DE 26:12. But his burden is not to show that the 1929 Act was solely animus-driven. Instead, it is to show that invidious discrimination was a "motivating factor." *Arlington Heights*, 429 U.S. at 265-66 ("*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes ... When there is a proof that a discriminatory purpose has been a motivating factor in

the decision, this judicial deference is no longer justified."). In any case, the legislators that Mr. Sanchez-Felix identified and quoted in his motion were not "nine" random "guys in Congress." DE 26:11. They were the drafters of the legislation and the heads of the immigration committee. And their racial animus permeated a legislative process that culminated in the law under dispute.

At a minimum, if the government truly wants to contest § 1326's discriminatory purpose, the way to do that should be through an evidentiary hearing, with actual experts on the topic, not just the cursory and conclusory arguments of government counsel. Those experts, as detailed in their affidavits accompanying Mr. Sanchez-Felix's motion, DE 22-3, 22-15, can trace the INA's enactment in 1952 from the enactment of the 1929 Act and contextualize any argument related to subsequent amendments of § 1326.[1]

## II.   CONCLUSION

The Court should dismiss the indictment. Alternatively, it should hold an evidentiary hearing to determine whether, as the government now claims, Congress would have passed the illegal reentry provisions of the 1929 Act without any racist motive or intent.

Respectfully submitted, this 2nd day of December, 2021.

> VIRGINIA L. GRADY
> Federal Public Defender
>
> *s/ Jared Scott Westbroek*
> JARED SCOTT WESTBROEK
> Assistant Federal Public Defender
> 633 17th Street, Suite 1000
> Denver, CO  80202
> Attorney for Defendant

---

[1] For example, Professor Lytle Hernandez, and Professor Gonzalez O'Brien provided testimony related to these issues in *United States v. Carrillo-Lopez*, ___ F. Supp. 3d ___, 2021 WL 3667330 (D. Nev. Aug. 18, 2021). A transcript of their testimony is attached hereto as Exhibit "A." Additionally, counsel will provide the expert testimony of Dr. S. Deborah Kang, whose affidavit was attached as Exhibit N. DE 22-15.

**CERTIFICATE OF SERVICE**

I hereby certify that on December 2, 2021, I electronically filed the foregoing **CARLOS GUADALUPE SANCHEZ-FELIX'S REPLY TO THE "GOVERNMENT'S RESPONSE TO [HIS] MOTION TO DISMISS THE INDICTMENT"** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Valeria N. Spencer at valeria.spencer@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

CARLOS GUADALUPE SANCHEZ-FELIX via U.S. Mail

*s/ Jared Scott Westbroek*
JARED SCOTT WESTBROEK
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Email:  jared_westbroek@fd.org
Attorney for Defendant