IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Criminal Case No. 21-cr-00310-PAB

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  CARLOS GUADALUPE SANCHEZ-FELIX,

     Defendant.

---

**ORDER**

---

This matter is before the Court on Carlos Guadalupe Sanchez-Felix's Motion to Dismiss the Indictment [Docket No. 22].  The government responded, Docket No. 26, and defendant replied.  Docket No. 32.  Defendant argues that the law that he was charged with violating, 8 U.S.C. § 1326(a), was enacted with a discriminatory purpose and therefore violates his right to equal protection and is "presumptively unconstitutional."  Docket No. 22 at 1.

## I.  BACKGROUND

The indictment charges defendant with one count of violating 8 U.S.C. § 1326(a).  Docket No. 1 at 1.[1]  The indictment alleges that defendant is an alien who "was

---

[1] That section states that:

any alien who-

     (1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

found in the United States after having been denied admission, excluded, deported, and removed from the United States on or about January 4, 2019, and without the express consent of the proper legal authority to reapply for admission to the United States." *Id.* The indictment also contains a notice of enhanced penalty, alleging that defendant's "denial of admission, exclusion, deportation[,] and removal was subsequent to a conviction for an aggravated felony offense." *Id.* at 2.

Defendant contends that § 1326 is presumptively unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), because it was enacted with a discriminatory purpose. *See generally* Docket No. 22. As such, defendant argues that the law should be reviewed under strict scrutiny. *Id.* at 6 n.3. Defendant also asks for an evidentiary hearing. *Id.* at 28. The government argues that the Court should apply rational basis review, that the law is constitutional, and that an evidentiary hearing is not necessary. Docket No. 26 at 1.

---

(2) enters, attempts to enter, or is at any time found in, the United States, unless

(A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or

(B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be fined under title 18, or imprisoned not more than 2 years, or both.

8 U.S.C. § 1326(a).

## II. ANALYSIS

### A.  Standard of Review

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws.  *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).  Thus, both the Fourteenth Amendment and the Fifth Amendment contain equal protection guarantees.  *See Buckley v. Valeo*, 424 U.S. 1, 93, 96 (1976) (noting that the "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.").

Courts apply varying standards in determining whether a statute that classifies people complies with the Constitution's equal protection guarantees.  If a law classifies people based on a suspect category, such as race or national origin, courts apply strict scrutiny.  *See, e.g.*, *Johnson v. California*, 543 U.S. 499, 505 (2005).  If a law classifies people based on a quasi-suspect class, such as gender, courts apply intermediate scrutiny.  *See, e.g.*, *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109 (10th Cir. 2008). If any other classification is involved, such as age or disability, courts review the action using rational basis scrutiny.  *See, e.g.*, *Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004).  Under strict and intermediate scrutiny, the plaintiff must also show that Congress intended for the law to discriminate.  The plaintiff may show congressional intent in one of three ways: (1) the law is facially discriminatory, *see, e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967); (2) the law has been applied discriminatorily, *see, e.g.*, *Yick*

3

*Wo v. Hopkins*, 118 U.S. 356 (1886); or (3) Congress had a discriminatory motive in enacting the law.  *See, e.g.*, *Arlington Heights*, 429 U.S. at 265–66.  Therefore, a facially neutral statute can violate equal protection principles if it both has a racially disparate impact and the legislature was motivated to enact the statute at least in part by racism.  *See Arlington Heights*, 429 U.S. at 265–66.

Defendant argues that the Court should review § 1326 under strict scrutiny consistent with *Arlington Heights* because the statute was enacted with a discriminatory purpose and thereby violates his Fifth Amendment rights.  *See generally* Docket No. 22.  The government argues that rational basis should apply because "judicial inquiry into immigration legislation is very limited, given that 'over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.'" Docket No. 26 at 5–6 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).  The government relies on the Supreme Court's recent decision in *Trump v. Hawaii*, where the Court held that, "[f]or more than a century, [the Supreme Court] has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'"  138 S. Ct. 2392, 2418–19 (2018) (quoting *Fiallo*, 430 U.S. at 792).  The Court emphasized that "'[a]ny rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and our inquiry into matters of entry and national security is highly constrained."  *Id.* at 2419–20 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81–82 (1976)). The Court also reiterated that its "opinions have reaffirmed and applied its deferential

standard of review across different contexts and constitutional claims." *Id.* at 2419. The government cites the Tenth Circuit holding that, when "Congress exercises [its] powers to legislate with regard to aliens, the proper standard of judicial review is rational-basis review." *Soskin v. Reinertson*, 353 F.3d 1242, 1255 (10th Cir. 2004). The government argues that § 1326, a provision of the Immigration and Nationality Act ("INA"), Pub. L. No. 82-414, 66 Stat. 163 (codified at 8 U.S.C. § 1, *et seq.*), is legislation concerning aliens and is, therefore, subject to rational basis review.

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Supreme Court has held that, because the Fifth Amendment's focus is persons rather than citizens, non-citizens present in the United States are entitled to the Fifth Amendment's protections. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (holding that non-citizens present in the United States are entitled to the protection of the Fifth Amendment); *Mathews*, 426 U.S. at 77 ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment . . . protects every one of these persons"). "[O]nce an alien arrives in the United States and begins establishing ties to the country, the [Supreme] Court has recognized certain constitutional protections extend to those persons, even if their presence is 'unlawful, involuntary, or transitory.'" *California v. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994, 1018 (N.D. Cal. 2020) (quoting *Mathews*, 426 U.S. at 77). As a result, courts have noted that there is a distinction between cases that concern "the political branches' authority to decide who to admit to the United States" and those that concern the government's "authority over

noncitizens already present."  *See, e.g.*, *United States v. Machic-Xiap*, 2021 WL 3362738, at *9 (D. Or. Aug. 3, 2021) (*comparing Hawaii*, 138 S. Ct. at 2403 (executive order restricting admission to the United States from seven Muslim-majority nations), and *Fiallo*, 430 U.S. at 788–89 (denial of admission preference to non-citizen children of unwed fathers and non-citizen unwed fathers of citizen children), *with Zadvydas*, 533 U.S. at 693 (noting that a non-citizen's presence in the United States "ma[kes] all the difference" and triggers heightened review because "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law")); *see also Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (punitive measures could not be imposed upon aliens ordered removed because "all persons within the territory of the United States are entitled to the protection" of the Constitution (quoting *Yick Wo*, 118 U.S. at 369).

In light of the distinction between non-citizens present in the United States and those outside the borders, *see Zadvydas*, 533 U.S. at 693; *Mathews*, 426 U.S. at 77, the Court finds that the government is mistaken that § 1326 should be reviewed under the rational basis standard.  Because § 1326 applies to "aliens who are already in the United States, [the government] cannot entirely rely on [Congress'] plenary power doctrine to uphold the [statute]."  *California*, 476 F. Supp. 3d at 1021; *see also United States v. Zepeda*, 2021 WL 4998418, at *2 (C.D. Cal. Jan. 5, 2021).  Rather, the Court finds, the nature of defendant's claim and his presence within the United States weigh in favor of applying *Arlington Heights* to his challenge.  *See, e.g.*, *United States v. Wence*, 2021 WL 2463567, at *3 (D.V.I. June 16, 2021) (reviewing § 1326 under

*Arlington Heights* standard); *United States v. Gutierrez-Barba*, 2021 WL 2138801, at *3 (D. Ariz. May 25, 2021) (same); *but see United States v. Novondo-Ceballos*, 2021 WL 3570229, at *3 (D.N.M. Aug. 12, 2021) (applying rational basis to § 1326); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915–16 (2020) ("*Regents*") (applying *Arlington Heights* standard to equal protection challenge against an immigration policy); *Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020) (applying *Arlington Heights* to review executive branch's repeal of immigration enforcement policies due to "the physical location of the plaintiffs within the geographic United States, the lack of a national security justification for the challenged government action, and the nature of the constitutional claim raised").

### B.  *Arlington Heights*

The Supreme Court has made clear that "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," and equal protection principles generally permit only limited review of validly enacted statutes. *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).  Under *Arlington Heights*, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  429 U.S. at 265–66 (a party asserting an equal protection claim must show that racial discrimination was at least "a motivating factor" for the action being challenged).  "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Id.* at 266.  A facially neutral law, such as the statute at issue here, "warrants strict scrutiny only if it can be proved that the law was

7

'motivated by a racial purpose or object.'" *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999);

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 220, 237 (1995) ("[R]acial

classifications of any sort must be subjected to 'strict scrutiny," which asks whether a

governmental act is (1) narrowly tailored; (2) to serve a compelling governmental

interest); *California*, 476 F. Supp. 3d at 1023 ("[I]f plaintiffs are able to demonstrate

racial or ethnic discriminatory purpose to be a motivating factor of the [statute], then the

court would apply a strict scrutiny standard of review."). This analysis involves inquiry

into factors such as the "impact of the official action," the "historical background of the

decision," the "specific sequence of events leading up to the challenged decision,"

"[d]epartures from the normal procedural [or substantive] sequence," and the "legislative

or administrative history." *Arlington Heights*, 429 U.S. at 266–68; *see also Brnovich v.

Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021).

The *Arlington Heights* factors are not exhaustive and no factor is dispositive.

429 U.S. at 268. "Whenever a challenger claims that a . . . law was enacted with

discriminatory intent, the burden of proof lies with the challenger." *Abbott v. Perez*, 138

S. Ct. 2305, 2324 (2018). If the plaintiff makes this *prima facie* case, the burden then

shifts to the government to show that "the same [governmental] decision would have

resulted even had the impermissible purpose not been considered." *Arlington Heights*,

429 U.S. at 270 n.21.

### 1. *Disparate Impact*

Whether the impact of an official action "'bears more heavily on one race than

another' may provide an important starting point" in the *Arlington Heights* analysis.

429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  Disparate impact is evidence of racial animus; however, it is rarely dispositive.  *Washington*, 426 U.S. at 242.

Defendant argues that, within a year of the passage of the Undesirable Aliens Act of 1929 (the "1929 Act"), which defendant characterizes as the "original version of § 1326" and the "original illegal reentry law," the government had prosecuted 7,001 "border crossing crimes" and, by 1939, that number had risen to 44,000.  Docket No. 22 at 2, 18.  In those years, according to defendant, individuals from Mexico comprised 84% of those convicted and often 99% of those charged.  *Id.*  In 2020, defendant argues, 99.1% of defendants sentenced for illegal reentry were Hispanic.  *Id.* Defendant also argues that, in 2000, 97% of people apprehended at the Mexican border were Mexican.  *Id.* at 23.  In 2005 and 2010, defendant claims that Mexicans made up 86% and 87% of apprehensions, respectively.  *Id.* at 23–24.  Between 2013 and 2019, between 98.1% and 99% of defendants in illegal reentry cases were Hispanic.  *Id.* at 26.

The government responds that the high percentage of "Mexican and Latin American defendants" is not "proof of disparate impact and discrimination," but, rather, the numbers are "a product of geography, not discrimination" because 99% of the Border Patrol's total encounters in 2019 were on the southwest border.  Docket No. 26 at 16.  The government relies on *Regents*.  *Id.*  Although the Supreme Court in *Regents* acknowledged that the Deferred Action for Childhood Arrivals ("DACA") recipients alleged the "disparate impact of the recission [of DACA] on Latinos," the Court held

9

that, "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. . . .  Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds."  140 S. Ct. at 1915–16.  While *Regents* does not foreclose defendant's disparate impact argument, it does indicate that disparate impact is not sufficient for his equal protection claim.

Some courts have held that criminal immigration statutes do not disproportionately affect Latinos because any disparate impact may be explained on grounds other than race, such as geographic proximity to the United States.  *See, e.g.*, *Novondo-Ceballos*, 2021 WL 3570229, at *5; *Gutierrez-Barba*, 2021 WL 2138801, at *4; *United States v. Rios-Montano*, 2020 WL 7226441, at *7 (S.D. Cal. Dec. 8, 2020); *United States v. Gallegos-Aparicio*, 2020 WL 7318124, at *3 (S.D. Cal. Dec. 11, 2020); *United States v. Morales-Roblero*, 2020 WL 5517594, at *10 (S.D. Cal. Sep. 14, 2020); *United States v. Lucas-Hernandez*, 2020 WL 6161150, at *3 (S.D. Cal. Oct. 21, 2020). Other courts have found that the geographic proximity explanation should not be addressed until the threshold question is answered, namely, whether the challenged law "bears more heavily on one race than another."  *See Davis*, 426 U.S. at 242. These courts have held that "[t]he [g]overnment's interpretation of disparate impact would seem to require a party challenging a law under the *Arlington Heights* intent test to show not only that a law had a discriminatory purpose, but also that it was discriminatorily applied."  *See, e.g.*, *Wence*, 2021 WL 2463567, at *9; *Machic-Xiap*,

2021 WL 3362738, at *10-11.  In *Arlington Heights* itself, the Court found that zoning restrictions limiting the building of low-cost housing may have disparately impacted African Americans, even though the impact was disparate because African Americans were disproportionately represented among those eligible for low-cost housing.  429 U.S. at 270.  *Arlington Heights* thus explains that disparate impact is not eliminated because the government may later show a race-neutral explanation.  The Court finds that defendant has shown that the illegal reentry statute disparately impacts Mexican and Latin American defendants because, between 2013 and 2019, over 98% of defendants in illegal reentry cases were Hispanic.  *See* Docket No. 22 at 26.  This indicates that the statute "bears more heavily on one race than another."  *See Davis*, 426 U.S. at 242.

Disparate impact is not sufficient to establish a constitutional violation, however. *See Regents*, 140 S. Ct. at 1915–16.  Because facially neutral policies are often "plausibly explained on a neutral ground," *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 275 (1979), a plaintiff must also show an "invidious" motive before finding the law unconstitutional.  *See Davis*, 526 U.S. at 242 ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution."); *Feeney*, 442 U.S. at 275 ("Just as there are cases in which impact alone can unmask an invidious classification, there are others in which – notwithstanding impact – the legitimate noninvidious purposes of a law cannot be missed." (citation omitted)).

### 2. Historical Background and Events Preceding Enactment

"The historical background of the decision is one evidentiary source" of the purposes for which a law is enacted because it can reveal "a series of official actions taken for invidious purposes," *Arlington Heights*, 429 U.S. at 267, or that racism or discriminatory views pervaded public thought when the law was enacted. *See Hunter v. Underwood*, 471 U.S. 222, 229 (1985) ("[T]he Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks.").

Defendant focuses mainly on the 1929 Act, which, as mentioned, defendant characterizes as the "original version" of § 1326. *See* Docket No. 22 at 2. The government argues that it is not appropriate to focus on the 1929 Act because that would be a challenge regarding the constitutionality of a repealed law. Docket No. 26 at 13-14. Instead, the government argues, defendant should have focused on the legislative history of the INA because the "governing statutory framework of the United States' immigration law comes from 1952, not the 1920s." *Id.* at 1, 13-14.

Courts analyzing the constitutionality of § 1326 have recognized that the historical background of the crime of illegal reentry, including that of the 1929 Act, is relevant to the Court's consideration of § 1326. *See, e.g.*, *Machic-Xiap*, 2021 WL 3362738, at *11–13; *Wence*, 2021 WL 2463567, at *5 (citing *Rogers v. Lodge*, 458 U.S. 613, 624–25 (1982) (considering past laws intended to disenfranchise Black people as evidence of intent that at-large election system was adopted with

discriminatory purpose).  However, these courts have also noted that *Arlington Heights* "directs the Court to look at the motivation behind the official action being challenged," which is not the 1929 Act, but rather § 1326 from the 1952 INA.  *See, e.g.*, *Wence*, 2021 WL 2463567, at *5 (citing *Arlington Heights*, 429 U.S. at 265–67 (describing intent analysis in terms of "the challenged decision")).

Defendant relies on the declaration of Kelly Lytle Hernández, PhD, a professor at the University of California, Los Angeles,[2] who discusses the eugenics movement and the "flood of immigration legislation fueled by fears of 'non-white' immigration," including the Chinese Exclusion Act of 1882.  Docket No. 22 at 7 (quoting Docket No. 22-3 at 1-2).  Professor Hernández describes the 1920s as the "Tribal Twenties" and recounts the rise of the Ku Klux Klan.  Docket No. 22-3 at 2.  Professor Hernández also describes the rise of anti-Mexican sentiment and the increase in "Nativists" in Congress, who were trying to narrow legal immigration.  *Id.* at 2-3.  Professor Hernández details the introduction of quotas based on immigrants' countries of origin and the growing tension between anti-Mexican legislators and those in the southwestern United States, who were dependent on Latin American laborers.  *Id.* at 3-4.

Assuming that the 1929 Act was motivated, at least in part, by racism, *see Machic-Xiap*, 2021 WL 3362738, at *11-13 (discussing the "prominent role" of eugenics in the original criminalization of illegal reentry); *Wence*, 2021 WL 2463567, at *6, the Court finds that the 23 years between the 1929 Act and the INA, gives the views of

---

[2] Defendants who have brought constitutional challenges to § 1326 appear to rely on Professor Hernández's declaration with regularity.  *See, e.g.*, *Machic-Xiap*, 2021 WL 3362738, at *11–13; *Wence*, 2021 WL 2463567, at *5-6; *Novondo-Ceballos*, 2021 WL 3570229, at *6.

congressional members in 1929 less probative value in determining the views of members of Congress in 1952, who passed § 1326.  *See Lamie v. United States Tr.*, 540 U.S. 526, 527 (2004) ("the starting point in discerning congressional intent . . . is the existing statutory text, and not the predecessor statutes." (internal citations omitted); *McClesky v. Kemp*, 481 U.S. 279, 298 n.20 (1987) ("[T]he 'historical background of the decision is one evidentiary source' for proof of intentional discrimination. . . .  But unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value. . . .  Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent." (citations omitted)); *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.  The ultimate question remains whether a discriminatory intent has been proved in a given case.  More distant instances of official discrimination in other cases are of limited help in resolving that question."); *see also United States v. Price*, 361 U.S. 304, 332 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.").  *Arlington Heights* also supports the Court's focus on the INA, rather than the 1929 Act, because the Court is to look at the government's motivations for the "challenged action," which is the INA, not the 1929 Act.  *See* 429 U.S. at 265.

Defendant argues that *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020), "confirm that the original discriminatory purpose that fueled a law's original enactment remains relevant when

14

assessing its constitutionality even when it has later been re-enacted."  Docket No. 22 at 19–22.  Defendant relies on these two cases to support his view that the racism of certain members of Congress in 1929 should be imputed to members of Congress in 1952.  *Id.* Defendant's reliance is misplaced.  Although the Court agrees that later re-enactments may not necessarily "cleanse the law of its original taint," *id.* at 21, defendant misreads *Ramos* and *Espinoza*.  First, neither case involved an equal protection challenge and neither held that the discriminatory motivations of an earlier legislature are controlling, or even persuasive, in a court's analysis of a later legislature's conduct.  Second, the cases confirm that the earlier legislature's conduct is relevant, which courts already take into account in applying *Arlington Heights*.  In both cases, the Court acknowledged that racism influenced the initial adoption of the relevant statutes, yet the Court held, in both cases, that the provisions were later adopted without the impermissible motives.  *See Espinoza*, 140 S. Ct. at 2259 (noting that Montana reimplemented the relevant provision "for reasons unrelated to anti-Catholic bigotry"); *Ramos*, 140 S. Ct. at 1401 n.44 (acknowledging dissent's argument that "Louisiana and Oregon eventually recodified their nonunanimous jury laws in new proceedings untainted by racism"); *see also Gutierrez-Barba*, 2021 WL 2138801, at *4 (rejecting a similar reading of *Ramos* and *Espinoza*); *Zepeda*, 2021 WL 4998418, at *2–3 (same); *Wence*, 2021 WL 2463567, at *5 (same); *United States v. Lazcano-Neria*, 2020 WL 6363685, at *6 (S.D. Cal. Oct. 29, 2020) (same); *Morales-Roblero*, 2020 WL 5517594, at *9–10; *United States v. Samuels-Baldayaquez*, 2021 WL 5166488, at *3 (N.D. Ohio Nov. 5, 2021) (dismissing similar argument regarding *Ramos*).

Therefore, the Court will focus on the historical background and events preceding the enactment of the INA in 1952. Defendant argues that the 1952 Congress's failure to "debate or otherwise discuss the problematic origins of the re-entry statute," which defendant interprets as Congress either "'ignor[ing]' the racial animus of the predecessor of the re-entry statute" or "decid[ing] to adopt that animus." Docket No. 22 at 22. Defendant relies on the veto statement of President Harry Truman, who said that the INA "would perpetuate injustices of long standing against many other nations of the world"; a letter from Deputy Attorney General Peyton Ford, who wrote to Senate Judiciary Committee Chairman Pat McCarran calling for the bill to be more punitive and describing the bill's targets as "wetbacks"; and a colloquial name of the bill as the "Wetback Bill." *Id.* at 22–23.

Although the legislative history of a statute, "especially where there are contemporary statements by members of the decisionmaking body," may provide evidence of racial animus, *Arlington Heights*, 429 U.S. at 268, the Supreme Court has recognized that "[i]nquiries into congressional motives or purposes are a hazardous matter." *United States v. O'Brien*, 391 U.S. 367, 383 (1968); *see also Hunter*, 471 U.S. 222, 228 ("Proving the motivation behind official action is often a problematic undertaking."). "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265.

Defendant's evidence is not sufficient for the Court to conclude that racial animus was one of Congress's motivations in enacting the INA. Defendant's evidence

16

does not, therefore, "flip[] the evidentiary burden on its head." *See Abbott*, 138 S. Ct. at 2325.  President Truman's veto statement does not show that Congress passed the bill with a racist motivation.  First, President Truman was not a member of Congress who voted on the INA.  Second, President Truman opposed the INA, and courts have cautioned that statements by a bill's opponents are not probative of Congress's motives.  *See, e.g.*, *Fieger v. U.S. Att'y Gen.*, 542 F.3d 1111, 1119 (6th Cir. 2008).  Third, as the court in *Machic-Xiap* noted, President Truman's veto statement "tells the Court nothing about what [he] thought about § 1326 specifically" because his "full statement reveals that his concern with the INA [was mostly] about the INA's continued use of the quotas that disfavored immigrants from Asia and southern and eastern Europe, not with its treatment of immigrants from Latin America."  2021 WL 3362738, at *13.

The statement of Deputy Attorney General Ford is not relevant to determining Congress's intent during the passage of the INA.  As with President Truman, Deputy Attorney General Ford was not a member of Congress, and his use of a racist slur does provide evidence of Congress's motivation.  To the extent he opposed the INA as not being sufficiently punitive, his views are less relevant being those of an opponent.  *See Fieger*, 542 F.3d at 1119.

The fact that some members of Congress apparently referred to the INA as the "Wetback Bill" is also insufficient evidence to determine Congress's motivation in passing the INA.  Defendant does not identify who referred to the bill with that slur or how widely the name was used.  Moreover, that some members of Congress may have had a racist motive in supporting the INA does not mean that Congress as a whole felt

17

similarly.  *See Brnovich*, 141 S. Ct. at 2349-50 ("And while the District Court recognized that the [one legislator's] 'racially-tinged' video helped spur the debate about ballot collection, it found no evidence that the legislature as a whole was imbued with racial motives.").[3]

### 3. Departures from the Normal Procedural or Substantive Sequence

"Departures from the normal procedural sequence" or "[s]ubstantive departures" from "the factors usually considered important by the decisionmaker" might afford "evidence that improper purposes are playing a role."  *Arlington Heights*, 429 U.S. at 267.  Although defendant discusses the remaining *Arlington Heights* factors with respect to the 1929 Act, *see* Docket No. 22 at 16–18 (discussing Congress's departures from the normal legislative process), defendant does not discuss this factor with regard to the passage of the INA.  Moreover, courts have found that the INA followed a "comprehensive review of the entire panoply of the nation's immigration laws," that "Congress passed the INA after study by committee and significant debate," and that there is nothing "substantively irregular about the INA or § 1326."  *See, e.g.*, *Machic-Xiap*, 2021 WL 3362738, at *14.

---

[3] Defendant asks the Court to "consider and adopt the factual findings" of *United States v. Carrillo-Lopez*, 2021 WL 3667330 (D. Nev. Aug. 18, 2021).  Docket No. 22 at 22–23.  The Court declines to do so.  First, it would be inappropriate to adopt the factual findings of another court.  Second, defendant has not explained whether this Court has been presented with the same evidence to be able to draw the same conclusion.  Third, the only specific evidence of the use of the term "Wetback Bill" in *Carrillo-Lopez* is that of a single senator, who noted that "a Bill known as the Wetback Bill[] was going to be debated."  2021 WL 3667330, at *14.  The Court does not find this evidence sufficient to establish that Congress as a whole enacted the INA with racial motives.  *See Brnovich*, 141 S. Ct. at 2349–50.

Even though defendant has shown disparate impact, defendant has failed to show that the historical background and events preceding the enactment of the INA were the product of an invidious motive, *see Davis*, 526 U.S. at 242; *Arlington Heights*, 429 U.S. at 267, or that racism or discriminatory views pervaded public thought. *See Hunter*, 471 U.S. at 229. The Court will, therefore, deny defendant's motion to dismiss the indictment.

### C.  Evidentiary Hearing

Defendant asks the Court to hold an evidentiary hearing to "further elucidate[] the law's discriminatory origins." Docket No. 22 at 2. Defendant states that "[e]xperts that have written extensively on the Undesirable Aliens Act of 1929 and can testify about the historical events surrounding its passage." *Id.* at 28.

As the court in *Novondo-Ceballos* noted, "an evidentiary hearing need not be granted as a matter of course." 2021 WL 3570229, at *6 (quoting *United States v. Boffa*, 89 F.R.D. 523, 528 (D. Del. 1981)). A hearing must be held "only if the moving papers allege facts with sufficient definiteness, clarity and specificity to enable the trial court to conclude that relief must be granted if the facts alleged are proved." *Id.* (quoting *United States v. Carrion,* 463 F.2d 704, 706 (9th Cir. 1972)). Here, defendant states that he will present testimony from expert witnesses and that experts have written extensively on the 1929 Act. Docket No. 22 at 28. Because the Court assumes that the 1929 Act was motivated, at least in part, by racism, and that such history is of limited relevance in reviewing the constitutionality of a provision of the INA, the Court finds that defendant's proposed testimony about the 1929 Act would not show that

19

defendant was entitled to relief.  *See Novondo-Ceballos*, 2021 WL 3570229, at *6
(citing *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980) (there is no need for
an evidentiary hearing where the materials provided to the court "show as a matter of
law that [the defendant] was not entitled to relief")).  The Court will therefore deny
defendant's motion for an evidentiary hearing.

## III.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Carlos Guadalupe Sanchez-Felix's Motion to Dismiss the
Indictment [Docket No. 22] is **DENIED**.


DATED December 28, 2021.


BY THE COURT:


PHILIP A. BRIMMER
Chief United States District Judge