IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal: 1:21-CR-310 (PAB) |
| CARLOS GUADALUPE SANCHEZ-FELIX, | |
| Defendant. | |

## CARLOS GUADALUPE SANCHEZ-FELIX'S REQUEST FOR A VARIANCE

Pursuant to the sentencing factors outlined in 18 U.S.C. § 3553(a), Carlos Guadalupe Sanchez-Felix respectfully request the Court impose a sentence of time served. A time-served sentence is appropriate because it reflects the nature and circumstances of the instant offense, the seriousness of the offense, and the need to promote respect for the law. Further, the nature and circumstances of the instant offense are not particularly aggravated. Instead, Mr. Sanchez-Felix reentered the United States because his life has been in the state of Colorado since he was thirteen; except for his father, all of Mr. Sanchez-Felix's family live in Colorado – including his partner and seven children. For all of the reasons detailed below, the Court should impose a time-served sentence.

### I. BACKGROUND FOR THE REQUESTED SENTENCE

As detailed in his motion to dismiss the indictment, Docket Entry Number ("DE") 22, the origins of 8 U.S.C. § 1326, under which Mr. Sanchez-Felix stands convicted, are grounded in anti-Latinx racism and the early-20th century fad of eugenics. This shameful and uncomfortable history is directly relevant to the Court's consideration of the nature and circumstances of the offense, the seriousness of the offense, and the need to promote respect for a law that seeks to criminalize individuals based largely on their "undesirable" race. The Court should also consider the disparate

criminalization of almost exclusively Latinx individuals under § 1326, while unauthorized immigrants from Canada and Europe who have overstayed their visas rarely, if ever, face criminal penalties. The Court is required to consider each of these factors under § 3553(a) and has discretion to consider policy arguments as necessary to impose a sentence "sufficient, but not greater than necessary." *See Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *Spears v. United States*, 555 U.S. 261, 264 (2009).

### A. A Stark Statistical Picture.

In fiscal year 2020, 19,654 people were convicted of illegal reentry pursuant to 8 U.S.C. § 1326 — a number that represented 82.7% of all immigration convictions nationwide.[1] More than 99% of the people convicted under § 1326 were Latinx.[2] In other words, of the 19,654 people convicted of unlawful reentry, only roughly 177 were not Latinx. These statistics are not the result of historical accident. Section 1326 was birthed, passed, and faithfully implemented to target and punish non-white immigration offenders.[3] These laws continue to be enforced to the same effect today as they were when they were enacted nearly a century ago — virtually unquestioned or challenged. It is telling that no criminal law counterpart exists for people who overstay their visas, a group that is also

---

[1] United States Sentencing Commission Quick Facts, "Illegal Reentry" (May 2021), attached hereto as Exhibit "A."
[2] *Id.*
[3] *See* Ian McDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, PROPUBLICA, June 19, 2018, https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy (last accessed July 6, 2021); Kelly Lytle Hernandez, *How Crossing the US-Mexico Border Became a Crime*, THE CONVERSATION, April 30, 2017, https://theconversation.com/how-crossing-the-us-mexico-border-became-a-crime-74604 (last accessed July 6, 2021); Libby Watson, *How Crossing the Border Became a Crime*, SPLINTER NEWS, June 29, 2018, https://splinternews.com/how-crossing-the-border-became-a-crime-1827160001 (last accessed July 6, 2021).

"illegally" in this country, but whose top countries of origin are Canada (est. 93,035 Fiscal Year 2016) and countries in Europe (est. 123,729 Fiscal Year 2016).[4]

On the other hand, more than 90% of those prosecuted for illegal reentry were Latinx. In fiscal year 2019, of the 22,077 illegal reentry cases reported, 99% of the defendants were Latinx.[5] In fiscal year 2018, of the 18,241 illegal reentry cases reported, 98.8% of the defendants were Latinx.[6] In fiscal year 2017, of the 15,767 illegal reentry cases reported, 98.9% of defendants were Latinx.[7] In fiscal year 2016, of the 15,744 illegal reentry cases reported, 98.7% of the defendants were Latinx.[8] In fiscal year 2015, of the 15,715 cases reported, 98.7% of defendants were Latinx.[9] In fiscal year 2014, of the 16,556 cases reported, 98.3% of defendants were Latinx.[10] In fiscal year 2013, out of 18,498 illegal reentry cases reported, 98.1% of defendants were Latinx.[11] The numbers speak for themselves.

B.   Mr. Sanchez-Felix's Background.

Mr. Sanchez-Felix first arrived in the United States in 1999, when he was just thirteen years old. His family immigrated from Mexico because of economic difficulties they experienced. Mr.

---

[4] Jeffrey S. Passel and D'Vera Cohn, *Homeland Security Produces First Estimate of Foreign Visitors to U.S. Who Overstay Deadline To Leave*, PEW RESEARCH CENTER, February 3, 2016, http://www.pewresearch.org/fact-tank/2016/02/03/homeland-security-produces-first-estimate-of-foreign-visitors-to-u-s-who-overstay-deadline-to-leave/ (last accessed July 6, 2021).

[5] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2019), attached hereto as Exhibit "B."

[6] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2018), attached hereto as Exhibit "C."

[7] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2017), attached hereto as Exhibit "D."

[8] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2016), attached hereto as Exhibit "E."

[9] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2015), attached hereto as Exhibit "F."

[10] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2014), attached hereto as Exhibit "G."

[11] United States Sentencing Commission Quick Facts "Illegal Reentry" (Fiscal Year 2013), attached hereto as Exhibit "H."

Sanchez-Felix's parents decided to move to Colorado because they had extended family here and wanted the support system family would provide. After moving to the United States, Mr. Sanchez-Felix attended school – junior high and high school – until withdrawing in the Eleventh Grade to help provide for his family. While Mr. Sanchez-Felix's father eventually returned to Mexico, his mother and four siblings remained in Colorado.

In 2003, Mr. Sanchez-Felix formed a relationship with Jackie Jimenez, resulting in a "common law marriage," until 2014. In their eleven-year relationship, Mr. Sanchez-Felix and Ms. Jimenez had three children. After Mr. Sanchez-Felix and Ms. Jimenez broke up, he entered into a relationship with Kendra Compean. Before that relationship ended in 2018, Mr. Sanchez-Felix and Ms. Compean had three children. *Id.* Mr. Sanchez-Felix and Ms. Jimenez then reconciled and had another child.

After being removed in 2018, Mr. Sanchez-Felix came back to the United States because his common law wife, his children, his mother, and siblings were all in Colorado. Beyond his father, Mr. Sanchez-Felix does not have many ties to Mexico; most of his family was in the United States. Simply, Colorado has been Mr. Sanchez-Felix's home for most of his life.

## II.     A TIME-SERVED SENTENCE IS APPROPRIATE UNDER THE § 3553(A) FACTORS

The Supreme Court has acknowledged that "courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101; *see also Gall v. United States*, 552 U.S. 38, 59 (2007) (finding a sentence outside the Guidelines to be reasonable). In fact, the Supreme Court has specifically clarified that "district courts are entitled to reject and vary categorically" from the Guidelines "based on a policy disagreement with those Guidelines." *Spears*, 555 U.S. at 266 (emphasis added).

When sentencing a criminal defendant under § 1326, the racialized historical context of the statute, its path to passage and the statistical evidence of its racially disparate execution throughout the years is relevant to the appropriate sentence. The § 3553(a) factors, informed by the origins of illegal reentry law, mandate a sentence far below the Guideline range calculated by the government.

### A.  Seriousness of the Offense.

The history and rhetoric around immigration offenses has urged their treatment as more serious than the conduct warrants. The zealous enforcement of a "zero tolerance" policy at the border – in play at the time Mr. Sanchez-Felix was taken into custody – relies heavily upon the same fervent racist vitriol that underpinned the original illegal reentry law. Indeed, then President Trump's fearmongering about "stone cold criminals" from Mexico and Central America attempting to enter the United States echoes the racial vitriol of Secretary of Labor Davis, who referred to Mexican men as "rat men," nearly a century ago. The past century of anti-Latinx rhetoric has unfairly portrayed undocumented Latinx immigrants as inherently "criminal." And, consequently, this rhetoric has disproportionately inflated the perceived seriousness of illegal reentry.

The seriousness of the offense in this case cannot be divorced from the fact that illegal reentry *is* a status offense. The first of the four elements the government must prove is that the defendant is an "alien." Moreover, unlike other crimes that include "status" as an element (such as being a felon in possession of a firearm) nothing about *any* of the elements or conduct of illegal reentry suggests that the offender presents a heightened risk to society, unless we continue to implicitly accept the same logic that led to the law's passage: that being a non-white alien is inherently "dangerous" or undesirable; that being Latinx is a predicate to criminality.

Accordingly, the seriousness of the offense weighs in favor of a time-served sentence.

### B. The Need to Avoid Unwarranted Disparities.

The illegal reentry prosecution statistics paint a stark picture. While the government may argue that the § 3553(a) focuses on the need to avoid unwarranted disparities in sentencing, not enforcement, the fact that almost *exclusively* Latinx people are convicted under § 1326 cannot be ignored. At the core of the dramatic racial disparity in criminalization of unauthorized Latinx immigrants, as compared to unauthorized non-Latinx immigrants, is more than just coincidence. This disparity is the result of an intentional decision made by legislators to criminalize "undesirable" immigrants, based on their racial inferiority, and *not* to create any criminal law counterpart for other immigrants, such as those who overstay their visas. As a result, Latinx immigrants not only suffer disparate sentences, relative to the non-existent sentences served by non-Latinx immigrants, but also the punitive, life-long consequences of a criminal conviction.

In *Kimbrough*, the Supreme Court expressly authorized district courts to vary below-Guidelines to remedy the racial disparities in punishment between crack and powder cocaine. The prevailing logic was that the drug quantity ratio for crack cocaine exponentially increased the amount of time a defendant charged with crack cocaine offenses would face, and because Black people were more likely to be convicted of crack cocaine offenses, the Guidelines resulted in significant racial disparities. But, notably, this disparity was not due to Black people using crack more than white or Latinx people. In fact, although more than 80% of the defendants sentenced for crack offenses were Black, more than 66% of crack users were white or Latinx.[12] White people were simply less likely to be prosecuted, more likely to be acquitted if prosecuted, and even if convicted, less likely to be sent

---

[12] Marc Mauer, *The Disparity on Crack-Cocaine Sentencing*, THE BOSTON GLOBE, July 5, 2006, archive.boston.com/news/globe/editorial_opinion/oped/articles/2006/07/05/the_disparity_on_crack_cocaine_sentencing/ (last accessed July 6, 2021).

to prison.[13] Thus, the disparity between crack and powder cocaine sentences under the Guidelines was compounded by racial disparities at earlier junctures in the criminal justice system.

Similarly, because illegal reentry laws were designed to punish only "undesirable" Latinx immigrants, and because present-day enforcement continues to faithfully fulfill that purpose, people like Mr. Sanchez-Felix are more likely to be prosecuted — by a factor of 99 to 1 — and consequently face time in prison as compared to non-Latinx immigrants. The Court should mitigate this disparity by granting Mr. Sanchez-Felix a downward variance to a time-served sentence.

Further, the average sentence imposed for a violation of § 1326 has steadily decreased over the past ten years. In, 2020 the average sentence imposed was eight months;[14] in 2019, it was nine months;[15] in 2018, it was ten months;[16] in 2017, it was twelve months;[17] in 2016, it was fourteen months;[18] in 2015, it was sixteen months;[19] in 2014, it was seventeen months;[20] and in 2013, it was eighteen months.[21]

### C.   Need to Promote Respect for the Law and Provide Just Punishment.

Illegal re-entry is, at its core, a trespass offense. As detailed in his motion dismiss, DE 22, Mr. Sanchez-Felix's trespass in the United States has been criminalized as a result of racial animus. While the racial animus underlying § 1326 is historical, the present-day enforcement of the law against almost exclusively Latinx people — many of whom, like Mr. Sanchez-Felix, have worked, built families, and otherwise contributed to society in the United States — is entirely consistent with

---

[13] Gabriel J. Chin, *Race, The War on Drugs, and the Collateral Consequences of Criminal Conviction*, 6 J. GENDER RACE & JUST. 253, 266 (2002).
[14] Exhibit A.
[15] Exhibit B.
[16] Exhibit C.
[17] Exhibit D.
[18] Exhibit E.
[19] Exhibit F.
[20] Exhibit G.
[21] Exhibit H.

the original intent of the law. While other laws stemming from similarly racist ideas have since been abandoned and relegated to the ash heap of history, the criminalization of illegal reentry has not. The racist history of illegal reentry cannot be ignored.

The racism and xenophobia embedded in U.S. immigration laws at the turn of the 19th century laid the groundwork for the criminalization of illegal reentry. At the end of the 19th century, Congress passed a series of laws aimed at stemming immigration from China, culminating in the Chinese Exclusion Act of 1882. Pub. L. No. 47-126, 22 Stat. 58. The legislative history of the Chinese Exclusion Act relied upon concerns about maintaining the racial purity of the United States that echo the legislative history of illegal reentry. Senator Henry M. Teller advocated for the Chinese Exclusion Act as a defense of white supremacy: "The Caucasian race has a right, considering its superiority of intellectual force and mental vigor, to look down upon every other branch of the human family. . . . We are the superior race today." 13 Cong. Rec. 1645, 1645 (1882). But, as the Supreme Court held in *Wong Wing v. United States*, 163 U.S. 228, 237 (1896), choosing to selectively exclude noncitizens based on race is fundamentally different from the criminal prosecution of noncitizens based on race.

Less than two decades after Senator Blease's illegal reentry law was passed in 1929, another act of trespass based on race was criminalized. Beginning in May 1942, any person of Japanese ancestry who "enter[ed]" or "remain[ed] in" in violation of an Executive Order would be "guilty of a misdemeanor and upon conviction shall be liable to a fine of not to exceed $5,000 or to imprisonment not for more than one year, or both." *Korematsu v. United States*, 323 U.S. 214, 216 (1944). In *Korematsu*, the Supreme Court upheld a trespass conviction under this provision in what has been broadly recognized as one of the most shameful decisions in our country's jurisprudential history. Justice Murphy dissented, noting that "[r]acial discrimination in any form and in any degree has no justifiable part whatever in our democratic way of life." *Id.* at 242. But although Justice

Murphy dissented "from this legalization of racism," Fred Korematsu was neither the first nor the last person of Japanese dissent criminally convicted as a result of anti-Japanese animus during World War II.

Some of this shameful history has been redressed. In 1965, the Immigration and Nationality Act of 1965 repealed racially-motivated national-origins quotas, which had been in place since the 1920s. But the Act did not repeal the 1929 illegal reentry law. Over the past several decades, jurists and legislators have revisited and confronted the racist legacy of *Korematsu*. In 1980, Congress established a commission to investigate the history of Japanese internment camps, conducted extensive interviews, and issued a report declaring the internment a "grave injustice" motivated by "racial prejudice, war hysteria and the failure of political leadership."[22] In 1988, President Reagan signed the Civil Liberties Act of 1988, authorizing $1.6 billion in reparations for Japanese-American survivors of internment.[23] And in 2018, the Supreme Court expressly overruled *Korematsu*, holding that "*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018).

Yet the even more dated, similarly racist origins of illegal reentry—which was similarly designed to criminalize people of a certain race for violating civil immigration laws—remain virtually unquestioned. Instead, the government continues to dramatically expand enforcement of § 1326,

---

[22] Bilal Qureshi, *From Wrong to Right: A U.S. Apology for Japanese Internment*, Nat'l Public Radio (Aug. 9, 2013), https://www.npr.org/sections/codeswitch/2013/08/09/210138278/japanese-internment-redress (last accessed July 6, 2021); Isabella Rosario, *The Unlikely Story Behind Japanese Americans' Campaign for Reparations*, Nat'l Public Radio (Mar. 24, 2020), https://www.npr.org/sections/codeswitch/2020/03/24/820181127/the-unlikely-story-behind-japanese-americans-campaign-for-reparations (last accessed July 6, 2021).
[23] *Id.*

reaching a new record of 22,077 cases prosecuted in fiscal year 2019.[24] In 2020, immigration-related prosecutions "accounted for the largest single group of offenses" federally prosecuted nationwide.[25]

Section 3553(a) requires the Court to evaluate the need to promote respect for the law and provide just punishment for the instant offense. Should the Court impose a longer sentence in prison to promote respect for a law grounded in racist and eugenicist beliefs about the inferiority of Latinxs and enforced 99% of the time against a single racial group, when the person reenters the United States to be with his family? Certainly not, even if illegal reentry has not yet been repealed or found unconstitutional.[26] Instead, the racist history and racially disparate enforcement of § 1326 support a variance down to a time-served sentence.

### D. Nature and Circumstances of the Offense.

Mr. Sanchez-Felix's conduct in the instant offense did not involve any allegation of violence, drugs, terrorism, or any other aggravating factor that might ordinarily warrant a higher sentence under the Sentencing Guidelines. Nor did the instant offense involve any allegation that Mr. Sanchez-Felix was returning to the United States to engage in any other criminal activity. Instead, Mr. Sanchez-Felix returned to the United States to be with his family. Most, if not all of us, would be similarly motivated to return to our family no matter the cost.

Mr. Sanchez-Felix has been sufficiently punished by the 254 days he has spent in federal custody since being arrested on September 14, 2021. Notably, while Mr. Sanchez-Felix has been in custody, he has taken advantage of a significant amount of programing; he has completed 369 hours

---

[24] Exhibit B. Notably, this number excludes criminal prosecutions under 8 U.S.C. § 1325.
[25] 2020 Annual Report and Sourcebook of Federal Sentencing Statistics, at 7, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf (last accessed July 6, 2021).
[26] The New Way Forward Act, which was introduced into Congress on December 10, 2019, would repeal both 8 U.S.C. § 1325 and § 1326. *See* New Way Forward Act, H.R. 5383, 116th Cong. § 601 (2019).

of programing. Mr. Sanchez-Felix received a certificate for "Outstanding Achievement" based on the help he provided to the detention center and other Spanish speaking inmates.[27] No additional incarceration is necessary.

### E. A Time-Served Sentence is Appropriate Because Mr. Sanchez-Felix Will Not Receive the Rehabilitative Benefits of a Longer Custodial Sentence that U.S. Citizens Incarcerated in BOP Facilities Receive.

Under Bureau of Prisons policy, Mr. Sanchez-Felix is not eligible for many of the programs and reentry resources designed to ensure that people leaving prison are able to get back on their feet—to give them a fair shot at success on the outside.[28] For example, the Bureau of Prisons has excluded individuals subject to ICE detainers from drug treatment and job training rehabilitation programs. *See McLean v. Crabtree*, 173 F.3d 1176, 1184 (9th Cir. 1999) (rejecting argument that exclusion of deportable aliens from rehabilitative programs violates prisoner's equal-protection rights). Mr. Sanchez-Felix's ineligibility for rehabilitative programs while in BOP custody weighs in favor of a time-served sentence. As District Judge Jack Weinstein of the Eastern District of New York has noted, "[r]ehabilitative concerns weigh especially strongly against a term of imprisonment where the defendant is subject to deportation upon completion of a sentence." *United States v. Chin Chong*, No. 13-CR-570, 2014 WL 4773978, *10 (E.D.N.Y. Sept. 22, 2014).

---

[27] A copy of the certificate is attached as Exhibit "I."
[28] Jacob Schuman, *Federal Prisons Don't Even Try to Rehabilitate the Undocumented*, THE MARSHALL PROJECT, Oct. 17, 2017, https://www.themarshallproject.org/2017/10/17/federal-prisons-don-t-even-try-to-rehabilitate-the-undocumented (last accessed July 6, 2021); *see also, e.g.*, Federal Bureau of Prisons Program Statement § 550.553 Residential Drug Abuse Treatment Program, Implementing Instructions, https://www.bop.gov/policy/progstat/5330_011.pdf, at p. 23 (last accessed July 6, 2021) ("A deportable inmate is unqualified for the RDAP because he or she cannot participate in the transitional drug abuse treatment component because he or she is not eligible for RRC placement.").

### III.   A TERM OF SUPERVISED RELEASE IS NOT RECOMMENDED UNDER THE GUIDELINES

The Guidelines specifically state that "[t]he court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment." U.S.S.G. § 5D1.1(c). A term of supervised release is not required by statute, and Mr. Sanchez-Felix will be removed from the United States after he has served his sentence. Accordingly, a term of supervised release is not recommended. *See* U.S.S.G. § 5D1.1 n.5 ("Unless [a defendant without legal status in the United States] legally returns to the United States, supervised release is unnecessary. If such a defendant illegally returns to the United States, the need to afford adequate deterrence and protect the public ordinarily is adequately served by a new prosecution."). The significant, and ever-mounting, penalties that await Mr. Sanchez-Felix should he ever return to the United States in the future are more than sufficient to deter him from violating U.S. immigration laws again.

### IV.   CONCLUSION

For the foregoing reasons, the Court should impose a sentence of time served, with no supervision to follow.

Respectfully submitted, this 18th day of May, 2022.

> VIRGINIA L. GRADY
> Federal Public Defender
>
> *s/ Jared Scott Westbroek*
> JARED SCOTT WESTBROEK
> Assistant Federal Public Defender
> 633 17th Street, Suite 1000
> Denver, CO  80202
> Telephone:  (303) 294-7002
> Email:  jared_westbroek@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2022, I electronically filed the foregoing **CARLOS GUADALUPE SANCHEZ-FELIX'S REQUEST FOR A VARIANCE** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Valeria N. Spencer at Valeria.Spencer@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Carlos Guadalupe Sanchez-Felix via U.S. Mail


*s/ Jared Scott Westbroek*
JARED SCOTT WESTBROEK
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Email:  jared_westbroek@fd.org
Attorney for Defendant